## Christman Estate

*Alvin L. Weiss,* for accountants.
*Desmond J. McTighe,* for Emma J. Destan.
*Ronald H. Reynier* and *M. Paul Smith,* for James F. Christman.

SATTERTHWAITE, *J.,* Specially Presiding, October 3, 1977 — Two previously undocumented questions arose at the audit hearings. One was the oral objection on behalf of Emma J. Destan, upon the presentation of accountants' supplemental statement to the disbursement shown therein on September 21, 1976, of $1,000 to Lawrence Sager, Esq., as the "Balance due Tyson and Gingrich claim." Miss Destan contends that this item was the individual obligation of James F. Christman (decedent's son and a coexecutor) and should not have been charged against the estate account.

Upon due consideration, the auditing judge agrees with Miss Destan's contention. The question arose by reason of a claim against decedent's insur-

ance business on account of the tortious failure of the firm in decedent's lifetime to provide appropriate liability coverage to an insured who was damaged by a third party's successful claim. Such established liability against decedent's firm by reason of this claim was discharged by the carrier of its "errors and omissions" liability insurance, except for the policy "deductible" amount of $1,000, the payment of which out of estate funds to the insured constitutes the item in question. The insurance client in whose favor the "errors and omissions" claim arose was a client of the firm who had been serviced by James F. Christman as an employe or representative thereof; the failure to provide the appropriate insurance coverage arose out of a policy or policies written by him. Accordingly, and notwithstanding that the liability *to the client* was that of the firm, i.e., decedent as the principal, nevertheless, *as between principal and agent,* the ultimate liability would be on the agent. In other words, while decedent was liable under the doctrine of respondeat superior to the client, decedent would have had an action over against his son as his employe or agent, whose neglect had actually incurred the liability. It follows, therefore, that the subject $1,000 payment should be regarded as though reimbursed to the estate for the purpose of computing distributive shares and charged in the schedule of distribution against the share of James F. Christman alone. . . .

Consideration may now be given to the several objections, or claims, presented on behalf of Emma J. Destan which formed the occasion for most of the lengthy and detailed evidence presented at the audit hearing. They all arise out of, or are concerned with, Item 2 of decedent's will which provided as follows:

"2. I give, devise and bequeath my insurance business to Emma J. Destan, my faithful employee for many years, together with all of the equipment and contents of my insurance office."

(By separate devise in Item 4, he also gave to Miss Destan the real estate in which said business was located at 12 South Hanover Street, Pottstown; no problems arise out of this devise, and its transfer has already been fully effectuated. By Item 10, after certain other specific bequests and devises, he gave his residuary estate one-third to Emma J. Destan and two-thirds to his son, James F. Christman.)

The broad issue presented in Miss Destan's claims is the interpretation and application of the Item 2 bequest of decedent's "insurance business" to Miss Destan, insofar as the scope and extent thereof may be concerned.

Decedent for many years had conducted a fire and casualty insurance business and a real estate brokerage firm in Pottstown under the fictitious name of James E. Christman & Son. This enterprise derived its firm name from decedent's father with whom he had been associated in years gone by, but since his father's death in the early 1930s, decedent had operated the business as an individual sole proprietorship. He had a staff of four or five employes, including James F. Christman, his son, and Emma J. Destan, his trusted office manager who had been in his employ since 1942. He was the general agent for certain insurance companies, having contracts with each which provided for the commissions to which he was entitled and required transmittal of net insurance premiums on policies written by the firm to the respective home offices within 45 days of the end of the month

within which such premiums fell due, whether or not actually collected from the insured clients. His real estate business apparently consisted largely of rental collections. The physical facilities of his offices were simple, being composed at his death of desks, chairs, filing cabinets, an office safe and other miscellaneous equipment, at an aggregate value of only $700.

Decedent's business records were also simple. The only master record or overall control of financial affairs of the firm, other than the individual account cards of each insurance company and each insured client and rental party, was through a journal or cash book into which each item of receipt and disbursement was entered by decedent or one of the staff. He had no occasion, as by applications for bank loans, to prepare formal balance sheet statements of assets and liabilities; so far as Miss Destan was aware, he had never reduced to writing any indication of what particular assets he believed his "insurance business" to be comprised, as contrasted with his other personal assets. There was no evidence as to the value of the "good will" of the enterprise or the worth of the right to write renewals or otherwise avail of the use of the firm name and company contracts.

For many years, decedent had maintained several bank accounts entitled in the firm name of James E. Christman & Son. The principal one was a checking account in the Industrial Valley Bank and Trust Company (hereinafter "IVB") into which most of the day-to-day business receipts, such as premiums and rents collected, were deposited and out of which all business disbursements (with certain exceptions hereinafter mentioned) were paid. Miss Destan, as well as decedent, had the authority to draw checks against this account. As of June 25,

1972, the date of decedent's death, the outstanding balance in this account on bank records was $148,237.63, but it was stipulated in the course of the audit hearings that by reason of outstanding checks and other adjustments, the effective balance as of decedent's death was actually $136,722.19. (Out of this account the sum of $60,000 was disbursed by the executors to Miss Destan on July 12, 1972, under the firm name of James E. Christman & Son, to permit her to carry on the business so bequeathed to her and to take care of on-going business obligations thereof. The then remaining balance of the IVB account in the amount of $72,878.30 was withdrawn by the executors who charged themselves with the receipt thereof as the "advance" shown as the second receipts entry on the first page of the within accounting.) Although receipts of decedent's business constituted the only source of the funds deposited in this IVB checking account (no other income such as decedent's dividends or interest on personal investments went into the same), decedent did on occasion pay personal and nonbusiness items by checks drawn thereon. Thus, in the interval between March 1970, and his death in June 1972, it appeared that at least 39 checks, in amounts varying from $10 to $750 and totalling over $4,100 were drawn on this account in payment of his medical, nursing and hospital bills. Whether there were, or were not, other "personal" disbursements therefrom did not appear.

Another checking account was maintained by decedent, likewise in the firm name of James E. Christman & Son, in Philadelphia National Bank (hereinafter "PNB"), decedent only having the right to draw checks thereon. This account, opened

in 1957, was relatively inactive; balances therein varied from a high of $26,568.68 for a few months in 1967 to a low of $1,355.78 in mid-1962. The date-of-death balance therein was $11,684.37. The source of funds deposited therein in the early years was exclusively business receipts of insurance and rental collections; in the last year or two prior to decedent's death, he occasionally also deposited nonbusiness dividends and interest therein. The withdrawals therefrom, totalling over $60,000 in decedent's lifetime, to the extent to which they may be identified, would seem to be largely either to banks or to a stock brokerage firm, as for purchases of certificates of deposit or other types of invested securities, or, since 1970, for payment of some medical bills. If any business disbursements were made from this checking account, they cannot be identified from the evidence.

A third checking account was maintained in the firm name of James E. Christman & Son in the Continental Bank, formerly Montgomery County Bank & Trust Company, and still earlier the National Bank of Pottstown. Again, decedent was the only party authorized to draw thereon. This account likewise apparently was funded by deposits of business receipts, and withdrawals were made for both the business purpose of contributions to the office employes' pension funds as well as the purchase of certain of decedent's personal investments in the form of bank certificates of deposit, and, on one occasion, the purchase of an individually titled automobile. Balances in this account, opened in 1954, varied from a high of $27,830.50 in August 1966, to a complete closeout (but later re-opening) in July 1964; withdrawals from 1954 to the date of decedent's death amounted to over

$75,000, and the balance on the latter date was $17,468.71. Subsequent to November 7, 1966, when decedent withdrew $15,000 for the purchase of a certificate of deposit in another bank, there was no activity in this checking account whatsoever except for one further deposit of $7,438.21 on August 3, 1970.

In addition to these three checking accounts, decedent also maintained two passbook savings accounts. One, captioned in the firm name of James E. Christman & Son, was in the First Federal Savings and Loan Association of Pottstown, opened on March 23, 1956, by deposit of a $10,000 check drawn on the firm's National Bank of Pottstown (later Continental Bank) checking account. No withdrawals were ever made therefrom, and there were no other deposits except the periodic accruals of interest thereon. The date of death balance in this account was $18,937.32. The other savings account captioned "B. Frank Christman, trading as James E. Christman & Son," was opened by decedent in the Montgomery County Bank and Trust Company (later Continental Bank) by the deposit on July 23, 1964, of $7,830.92 consisting of a transfer of $2,827.11 from the firm's checking account in that bank (temporarily closing out the latter) plus a deposit of $5,003.81 of business receipts; another deposit of $2,172.10 of business receipts was made to this savings account on August 10, 1964. Thereafter, no further deposits were made (except periodic interest accruals), nor were any amounts withdrawn; the date-of-death balance therein was $13,570.31. The passbooks for both of these savings accounts were kept in the office safe.

Accountants' inventory, as filed, disclosed that decedent had a gross testamentary estate valued as of the date of death in excess of $350,000. It in-

cluded real estate rated at $21,500, U. S. Series E bonds at present values aggregating $119,601.79, stocks and bonds totaling $37,274.82, bank certificates of deposit and savings accounts and accrued interest thereon (including the First Federal and the Continental savings accounts in the firm name just mentioned) amounting to $136,552.93, miscellaneous assets (including the insurance-realty business in question, carried at a net worth of $5,409.41 on the basis of a tentative or estimated post-death balance sheet which included the IVB checking account at $134,322.21 as the only bank account) aggregating $12,170.66, and the PNB and Continental checking accounts held in the firm name, supra, together amounting to $29,153.08.

Except for the three checking accounts and the two savings accounts captioned in the firm name as already discussed, all of the above assets were registered in decedent's name individually. Some of the bonds, stock certificates, certificates of deposit and like documentation of these assets were kept (or at least found after decedent's death) in the office safe; others thereof without significant distinction were in the bank safe deposit box. Decedent had no individual checking account which did not bear the firm designation as hereinabove described, and the record does not divulge how he treated such dividend or interest income or paid such personal bills as everyday living or other expenses as were not handled through one of the firm-name checking accounts, supra.

The evidence disclosed the following further matters of information concerning the financial situation of decedent's subject insurance business. From the tentative post-death balance sheet, it appears that the firm was thought to have had accounts receivable of $92,285.92, less a fifteen per-

cent reserve for uncollectible items or a net of $78,443.04. It also appears therefrom that stated commissions due Miss Destan and loans payable to her were carried at $50,313.92 and $68,800.92. (The receivables and the latter two liabilities to Miss Destan were not the subject of other evidence and the record is equivocal as to what evidential effect, if any, is to be given the same. See page 56 of the stenographic transcript as to the limited purpose for which this exhibit was offered and received to explain the basis for the inventory valuation of the business and to relate the IVB checking account balance thereto.)

From the first and second pages of Exhibit D-34, as supplemented by the testimony of Roxanne Stong in certain respects, it is found that the date-of-death total of net premiums due the various insurance companies on policies written or renewed prior to decedent's death amounted to $79,146.52; from the third page of Exhibit D-34 it is found that total rents collected and payable over, or tenants' rental deposits to be repaid, or other current accounts payable by reason of amounts due prior to decedent's death came to $1,455.77; from the fourth page of Exhibit D-34 it is found that total return premiums due insureds accrued at decedent's death were $1,264.24; from Exhibit D-35 it is found that the total of rental deposits collected and held by the firm prior to decedent's death and which will eventually be refundable aggregated $1,465.

Emma J. Destan's filed written claimant's statement sets forth her contentions in apparently alternative forms concerning the scope of the Item 2 bequest of decedent's "insurance business" to her. The first and second of these numbered claims were for the dollar amounts which she alleged that

she was obliged to pay to the several insurance companies and to disburse rental escrow funds, respectively, for amounts attributable to decedent's lifetime; the third and fourth were more general formal claims of the business plus the equipment and contents of the office, the third specifically demanding the date-of-death balances in the IVB, PNB and Continental checking accounts, plus the date-of-death balances in the First Federal and the Continental savings accounts, i.e., all of the checking or savings accounts held by decedent in the firm name of James E. Christman & Son. While she did offer evidence, as above summarized, of the pre-death accruals of business liabilities to others which she would be obliged to assume to go forward with the business, she specifically disclaimed any purpose to recover such amounts in addition to the bank deposits.

Parenthetically, it may here be noted that she orally amended the Item 3 claims at the audit hearing so as also to include therein $45,000 in three certificates of deposit (all found in the office safe) and over $100,000 in date-of-death values of U. S. Series E bonds (some in the office safe and others in the bank safe deposit box), all of which, in substantial part, were shown to have been acquired by decedent with funds originating in one of the firm-name checking accounts but which had all been registered in his individual name. In the course of argument at the conclusion of the hearing, counsel for Miss Destan specifically conceded that he was withdrawing this amended claim and was actually seeking in this connection only those assets held in the firm name. He also pointed out that he was not relying upon the circumstance that some of these assets were located in the office safe and any theory

that therefore they might arguably be regarded as "contents of my insurance office."

After due deliberation, the auditing judge has come to the considered decision that decedent did intend to include the three checking accounts and the two savings accounts in question, and also the accounts receivable, as includible in his bequest of "my insurance business" to Miss Destan, with the understanding, of course, that all business-related liabilities would be burdened thereon. This conclusion is reached (1) because of the firm-name caption which he used not only on the IVB account (which would seem unquestionably to be a business and not a personal one) but also on the others which were specifically so set up in marked contrast to still other withdrawals which he availed of for his own personal, nonbusiness use by registrations of bonds, certificates or an automobile in his individual name; and (2) by reason of a rational motive or occasion for so doing, in that he was required by statute, (section 633.1 of The Insurance Department Act of May 17, 1921, P.L. 789, as amended, 40 P.S. §273.1, as to insurance funds, and the Real Estate Brokers License Act of May 1, 1929, P.L. 1216, as amended, 63 P.S. §440, as to real estate funds), to treat all collections ultimately payable over to others as fiduciary funds, for failure of which he would be subject to drastic punitive sanctions, and from his manner of keeping books with no overall control ledger, he was compelled at all times to maintain substantial, and possibly even excessive, funds on deposit in readily available and unambiguously identified business accounts.

The auditing judge has neither found, nor been referred to, any precedents which are on all-fours, or even significantly analogous to, the instant situ-

ation, except possibly Durham Estate, 62 Ill. App. 2d 111, 210 N.E. 2d 632, 28 A.L.R. 3d 1161 (1965), which held that a bequest of "my insurance business" included a "Premium Fund Trust Account" (which on occasion included some undistributed profits of the business in addition to funds payable over to others) as well as accounts receivable, although the legatee had conceded that a general bank account was not so included. The Annotations in 28 A.L.R. 3d 1169 collect other arguably analogous decisions, but the consensus would seem to be that each case is necessarily sui generis. Fenno Estate, 12 Fiduc. Rep. 434 (1962), a decision of this court, while being occasioned by the bequest of an insurance business to an employe, really only involved the question of whether or not the insurance agency contracts so purportedly transferred had taxable value for inheritance tax purposes.

The auditing judge, therefore, hereby holds that claims of Emma J. Destan numbered one and two are overruled; those numbered three and four are sustained and allowed in accordance with the foregoing decision.

Claims five, six and seven are for rental and insurance commissions allegedly due her by decedent over past years. The auditing judge is uncertain as to how the parties intended the court to make disposition of these claims. At the outset of the hearing, counsel indicated that they were still in issue. No evidence in support thereof, however, was ever adduced. Indeed, the only mention of the same in the whole record was in the tentative balance sheet where such liabilities were treated as business liabilities, presumably to be borne by business assets if the bank accounts were included therein. But even here, the stenographic transcript

shows that neither side would agree to be bound by matters in that exhibit. To clear the record, and to permit the parties to correct any possible misunderstanding on the part of the auditing judge by appropriate exceptions, claims numbered five, six and seven are hereby denied and overruled. . . .

The account is hereby confirmed, and it is ordered and decreed that Emma J. Destan and James F. Christman, executors as aforesaid, shall make and pay the distributions herein awarded forthwith upon the absolute confirmation of the schedule of distribution herein directed to be filed.

And now, October 3, 1977, the within adjudication is directed to be filed and is hereby confirmed nisi.

## FINAL DECREE

SATTERTHWAITE, *J.*, Specially Presiding, and TAXIS, *JJ.*, December 6, 1977 — And now, December 6, 1977, after argument, the exceptions filed on behalf of James F. Christman to the adjudication, numbered 1(d) and 1(e), to the effect that the auditing judge erred in awarding the $18,937.32 balance in the First Federal Savings and Loan Association of Pottstown savings account and the $13,570.31 balance in the Continental Bank savings account, respectively, to Emma J. Destan as included in decedent's "insurance business" bequeathed to her under Item 2 of decedent's will, are hereby sustained; said savings account balances are hereby determined not to be included in decedent's "insurance business" and are, accordingly, hereby awarded to the residuary legatees. In all other respects, said exceptions are denied and overruled, and the adjudication of the auditing judge is hereby approved and adopted as the final decree of this court.